UNITED STATES *v.* JUDSON-SHELDON CORP. (No. 4623) [1]

---

[1] C. A. D. 424.

United States Court of Customs and Patent Appeals, February 2, 1950

*David N. Edelstein*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.
*Eugene R. Pickrell* (*Michael Stramiello, Jr.*, of counsel) for appellee.

[Oral argument December 6, 1949, by Mr. Weeks and Mr. Pickrell]

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Associate Judges

JACKSON, Judge, delivered the opinion of the court:

This appeal is from the judgment of the United States Customs Court, Third Division, given pursuant to its decision, C. D. 1168, sustaining the protest of· appellee, directed against the collector's assessment of duty on frozen beef livers imported at the Port of New York from Argentina on October 15, 1945, under paragraph 706 of the Tariff Act of 1930, as modified by the trade agreement with Canada, T. D. 49752. The importation was classified as "Edible Animal Livers."

In the protest it was claimed that the merchandise is free of duty under paragraph 1669, as a crude drug of animal origin or alternatively under paragraph 34, as a drug of animal origin advanced in value or condition, at 10 per centum ad valorem. The trial court held the involved merchandise properly to be classifiable as a crude drug, and the second claim of the protest is not before us.

· The paragraph under which the merchandise was classified reads as follows:

Par. 706 [as modified by T. D. 49752]. Edible animal livers, kidneys, tongues, hearts, sweetbreads, tripe, and brains, fresh, chilled, or frozen, 3¢ per lb., but not less than 15% ad val.

The paragraph under which the court held the merchandise properly to be classifiable reads as follows:

Par. 1669. Drugs such as barks, * * * and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided*, That no article containing alcohol shall be admitted free of duty under this paragraph. [Free.]

The issue here is whether or not the beef livers are edible, and whether or not they are crude drugs.

The trial of the suit was begun at Indianapolis and finished in New York.

Six witnesses testified on behalf of appellee and two for appellant. There is no controversy concerning the facts.

It appears that the livers were imported in sealed barrels and were the same in appearance as beef livers produced in the United States for use as food and other purposes. No analysis was made as to their being infected with any kind of disease, including foot-and-mouth disease, rinderpest or anthrax. Neither does it appear that they contained any alcohol or were denatured or treated with any adulterant.

Eli Lilly and Company, Pharmaceutical Manufacturers of Indianapolis, was the ultimate consignee of the imported merchandise. In strict accordance with all pertinent Government regulations with respect to the importation and the handling thereof, the livers were processed at the plant of the Lilly Company until a syrupy extract was produced, which was manufactured into a liver-stomach concentrate by having mixed with it whole hogs' stomachs finely ground, digested, dried, defatted and powdered. The concentrate is known in pharmacy as an antianemia powder when mixed with different iron preparations, such as "iron ammonium citrate green or ferrous sulphate, with some Vitamin $B_1$ which has been absorbed on starch mixed with it * * *." Some of the products of the company, made as above indicated, are called Lextron 55, Lextron 66 and Extralin, valuable in the treatment of pernicious anemia, nutritional anemia, macrocytic anemia and iron deficiency anemias. The liver extract contains 40 to 45% solids, in which there are the therapeutic properties found naturally in beef livers.

It appears in the record from the testimony of each of the Government witnesses that one of the livers was cooked and partly consumed by them without producing any ill after-effects.

Under the tariff laws of the United States, the importation of certain meats is prohibited by section 306 of the Tariff Act of 1930 as follows:

SECTION 306. CATTLE, SHEEP, SWINE, AND MEATS—IMPORTATION PROHIBITED IN CERTAIN CASES.

(a) *Rinderpest and Foot-and-Mouth Disease.*—If the Secretary of Agriculture determines that rinderpest or foot-and-mouth disease exists in any foreign country, he shall officially notify the Secretary of the Treasury and give public notice thereof, and thereafter, and until the Secretary of Agriculture gives notice in a similar manner that such disease no longer exists in such foreign country, the importation into the United States of cattle, sheep, or other domestic ruminants, or swine, or of fresh, chilled, or frozen beef, veal, mutton, lamb, or pork, from such foreign country, is prohibited.

(b) *Meats Unfit for Human Food.*—No meat of any kind shall be imported into the United States unless such meat is healthful, wholesome, and fit for human food and contains no dye, chemical, preservative, or ingredient, which renders such meat unhealthful, unwholesome, or unfit for human food, and unless such meat also complies with the rules and regulations made by the Secretary of Agriculture. * * *

(c) *Regulations.*—The Secretary of Agriculture is authorized to make rules and regulations to carry out the purposes of this section, and in such rules and regula-

tions the Secretary of Agriculture may prescribe the terms and conditions for the destruction of all cattle, sheep, and other domestic ruminants, and swine, and of all meats, offered for entry and refused admission into the United States, unless such cattle, sheep, domestic ruminants, swine or meats be exported by the consignee within the time fixed therefor in such rules and regulations.

and section 111 of Title 21, U. S. C., which provides:

The Secretary of Agriculture shall have authority to make such regulations and take such measures as he may deem proper to prevent the introduction or dissemination of the contagion of any contagious, infectious, or communicable disease of animals and/or live poultry from a foreign country into the United States or from one State or Territory of the United States or the District of Columbia to another, and to seize, quarantine, and dispose of any hay, straw, forage, or similar material, or any meats, hides, or other animal products coming from an infected foreign country to the United States, or from one State or Territory or the District of Columbia in transit to another State or Territory or the District of Columbia whenever in his judgment such action is advisable in order to guard against the introduction or spread of such contagion. (Feb. 2, 1903, ch. 349, § 2, 32 Stat. 792; Feb. 7, 1928, ch. 30, 45 Stat. 59.)

In accordance with the authority vested in the Secretary of Agriculture, the following regulations were issued:

### Order to Prevent the Introduction into the United States of Rinderpest and Foot-and-Mouth Disease [B. A. I. Order 373]

Sec. 94.1. *Existence of rinderpest or foot-and-mouth diseases importations prohibited.*—Notice is hereby given that I, Paul H. Appleby, Acting Secretary of Agriculture, have determined that the contagious and communicable disease of rinderpest or of foot-and-mouth disease exists in the following foreign countries: * * * Argentina, * * *; and I have so officially notified the Secretary of the Treasury. Wherefore, the importation into the United States of cattle, sheep, or other domestic ruminants or swine (including the entry into any port of the United States of any vessel having on board as sea stores such animals from the above-named countries) or of fresh, chilled, or frozen beef, veal, mutton, lamb, or pork, from the countries above named, is prohibited. (Sec. 306, 46 Stat. 689; 19 U. S. C. 1306.)

\* \* \* \* \* \* \*

Sec. 94.3. *Organs, glands, extracts, or secretions of ruminants or swine.*—No fresh, chilled, or frozen organs, glands. extracts, or secretions derived from domestic ruminants or swine, orginating [sic] in any country named in section 94.1, shall be entered into the United States except for pharmaceutical purposes. (Sec. 2, 32 Stat. 792; 21 U. S. C. 111.)

\* \* \* \* \* \* \*

### Part 95—Sanitary Control of Animal Byproducts (Except Casings), and Hay and Straw, Offered for Entry into the United States [B. A. I. Order 371]

\* \* \* \* \* \* \*

### Regulation 17

Sec. 95.17. *Glands, organs, ox gall, and like materials; requirements for unrestricted entry.*—Glands, organs, ox gall or bile, bone marrow, and various like

materials derived from domestic ruminants or swine, intended for use in the manufacture of pharmaceutical products, which do not meet conditions or requirements specified in paragraph (a) or (b) following, shall not be imported except subject to handling and treatment in accordance with section 95.18 of this order:

(a) Such glands, organs, or materials may be imported without other restriction if originating in and shipped directly from a country not declared by the Secretary of Agriculture to be infected with foot-and-mouth disease or rinderpest.

(b) Such glands, organs, or materials may be imported without other restriction if accompanied by the certificate of a consular officer showing that in process of preparation the particular product was subjected to a temperature of not less than 156° F. (68.9° C.).

## Regulation 18

Sec. 95.18. *Glands, organs, ox gall, and like materials; importations permitted subject to restrictions.*—Glands, organs, ox gall or bile, bone marrow, and various like materials derived from domestic ruminants or swine, which do not meet the requirements of section 95.17 of this order may be imported for pharmaceutical purposes if in tight containers and consigned to an approved establishment: *Provided, however,* That upon special permission of the Chief of Bureau they may be stored for a temporary period in approved warehouses under bond and under the supervision of an inspector. They shall be handled and processed at the said establishment in a manner approved by the Chief of Bureau and the containers shall be destroyed or disinfected as prescribed by him. They shall not be removed therefrom except upon special permission of the Chief of Bureau and upon compliance with all the conditions and requirements of this section relative to the movement of the said glands, organs, or ox gall, and like materials from the port of arrival to the said establishment.

It should be noted that under the quoted laws and regulations the imported livers, as either frozen organs or glands, were barred from entry into the United States except for pharmaceutical purposes and for that purpose only. The instant merchandise was imported with strict observance of all pertinent regulations of the United States Government.

Substances which are "edible" are commonly known and so defined by the dictionaries as being "eatable" or "suitable to be eaten." That is likewise true in a tariff sense. *United States* v. *Paul Puttmann*, 21 C. C. P. A. (Customs) 135, T. D. 46466; *United States* v. *Yick Shew Tong Co.,* 25 C. C. P. A. (Customs) 255, T. D. 49392.

It is clear to us that the involved frozen beef livers can not properly be held to be edible. All meat products from Argentina, with the exceptions noted in the laws and regulations, are considered unfit for human consumption. That is not merely a fiction declaring something to be inedible merely by fiat of law. It is a finding by the duly constituted United States authorities that such proscribed importations are in fact unfit for human consumption. Therefore, it can be successfully contended that such meats are inedible even though the record discloses, as hereinbefore mentioned, that some of the liver had been cooked and eaten without ill effects.

We see no violent or strained meaning in our holding, such as was stated in the case of *Cruikshank* v. *United States,* 59 Fed. 446 (C. C. A.

2nd 1894), decided under the tariff act of 1890, and which is cited in the brief of appellant. Neither can we properly say that the imported merchandise is edible because it appears that some of it was eaten after cooking, as was held in the case of *United States* v. *Paul Puttmann, supra.*

The case of *F. W. Myers & Co., Inc.* v. *United States*, 29 C. C. P. A. (Customs) 30, C. A. D. 167, which is pointed out in the brief of appellant as being closely enough in point to be controlling here, is not apposite. There, as here, the subject matter out of which the issue arose was a shipment of frozen beef livers from Canada for use in the Lederle Laboratories in the manufacture of liver pharmaceuticals designed for treatment of pernicious anemia. In that case the liver could not be imported as food, unless before shipment from Canada a pure food label was applied to the package and a certificate issued corresponding to the number of the label, signed by an inspector of the Department of Agriculture, on which it was stated that the meat had been properly prepared under sanitary conditions.

It was not necessary to observe those requirements with respect to the merchandise in the *Myers* case, *supra*, for the reason that it was not imported for food stuff. The vital distinction between the facts in that case and the facts before us is that there frozen beef livers could be imported as food, while here such merchandise could not be imported except for pharmaceutical purposes, and the reason for the banning of importations, such as that involved here, is that it has been found as a fact that it is unfit for human consumption, and therefore can not be held to be edible. We stated in the *Myers* case, *supra*, that it did not seem logical to distinguish between meat which is edible in fact and meat which is edible only by reason of law. The reason for such statement is obvious from the facts in that case, and clearly is not pertinent under the facts of the instant case.

It was the burden of appellee to prove not only that the classification made by the collector was erroneous, but further to show that the merchandise is a crude drug.

In discussing that phase of the issue, appellant cited the case of *United States* v. *Judson Sheldon Corp.*, 33 C. C. P. A. (Customs) 73, C. A. D. 318. The facts there disclosed that the merchandise involved was liver extract obtained by the processing of beef livers in Brazil. It was the contention of the Government there that the extract, as imported, was an advanced drug made from beef livers which it argued was a crude drug. We stated in our opinion that the livers from which the extract was made were not crude drugs, and in support of that statement the *Myers* case, *supra*, was cited. It was further stated that those livers were edible and of the kind used in both the exporting country and here for food purposes, and the classification

made by the collector that the merchandise was an advanced drug did not necessarily imply that the collector found that the livers were drugs. His classification, we said, might imply he found that a drug made from a material which was not a drug had been advanced after it became a drug. We affirmed the judgment of the United States Customs Court which had sustained the protest of the appellee.

In the instant case, it can not be correctly said, as was stated in the *Judson Sheldon* case, *supra*, that the livers, such as imported here, are used in this country for food purposes. To revert to what we have mentioned more than once herein, the imported frozen livers are not, and can not, be used for food purposes in this country.

The therapeutic values of the inedible beef livers herein are naturally contained in the livers. Those therapeutic values are carried into the antianemia pharmaceutical preparations. There can be no question but that those properties are drugs, and it is difficult to imagine anything more crude, having therapeutic values, under the facts in this case, than the imported merchandise from which the therapeutic substance or substances have been extracted.

The judgment of the United States Customs Court is *affirmed*.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case and did not participate in the decision.